In the Matter of WILLIAM MERTENS, as a Judge of the Civil Court of the City of New York.

First Department, March 25, 1977

*Bernard Persky* and *Barry M. Vucker* of counsel *(Gerald Stern,* attorney), for petitioner.

*Roy L. Reardon* and *Rolan W. Reed* of counsel *(Simpson Thacher & Bartlett,* attorneys), for respondent.

*Per Curiam.* This is a proceeding for the removal of Honorable WILLIAM MERTENS, a Judge of the Civil Court of the City of New York.

On October 3, 1975, after an investigation of complaints of

judicial misconduct, in accordance with the then subdivision 6 of section 43 of the Judiciary Law, the Temporary State Commission on Judicial Conduct (the "Commission") submitted a report to the Appellate Division, First Judicial Department, recommending the commencement of proceedings to remove from office Civil Court Judge WILLIAM MERTENS. The Commission also submitted proposed charges to be served upon Judge MERTENS. By order of the Appellate Division, First Judicial Department, dated December 12, 1975, pursuant to section 429 of the Judiciary Law, the Commission was designated as petitioner to prepare and serve charges on Judge MERTENS, and Supreme Court Justice JOSEPH DIFEDE was designated (as referee) to hear evidence, make appropriate findings, and report to the Appellate Division.

In accordance with the Appellate Division's direction, the Commission served a petition dated December 15, 1975 containing 101 numbered charges. Hearings were held before Justice DIFEDE from March 15, 1976 to May 25, 1976. Over 6,700 pages of testimony were taken and numerous and voluminous exhibits were received. Thereafter the parties submitted briefs.

With extraordinary diligence and promptness, Justice DIFEDE on July 30, 1976 prepared and submitted to this court an exhaustive and painstaking report. In the course of that report, he sustained 50 charges, 36 in full and 14 in part.

Briefs in support and in opposition to the report were then filed in this court, the reply brief being filed November 3, 1976, and the matter now comes before us for decision.

### JURISDICTION

This proceeding was instituted pursuant to the provisions of former subdivision i of section 22 of article VI of the State Constitution, and former section 429 of the Judiciary Law, which read in part as follows:

State Constitution (art VI, § 22, subd i):

"A judge of the courts for the city of New York established pursuant to section fifteen of this article * * * may, in the manner provided by law, be removed for cause or retired for disability after due notice and hearing by the appellate division of the supreme court of the judicial department of his residence."

Judiciary Law (§ 429):

"A judge of the courts for the city of New York established pursuant to section fifteen of article six of the constitution * * * may be removed for cause or retired for disability, as provided by the constitution, by the appellate division of the supreme court."

Section 22 of article VI of the State Constitution was amended and former subdivision i was eliminated by constitutional amendment, whose effective date was September 1, 1976 (NY Const, art VI, § 36-c). The amendment provided for a new procedure for censure, suspension, or removal for cause or compulsory retirement for disability of "[a]ny judge or justice of any court in the unified court system". (art VI, § 22, subd a.) In essence, these powers are ultimately vested in a Court on the Judiciary, subject to permissive appeal to the Court of Appeals; the Appellate Division apparently does not have removal jurisdiction with respect to cases governed by the new procedure. Section 429 of the Judiciary Law was repealed by the Laws of 1976 (ch 691, § 2), effective September 1, 1976. However, section 3 of the repealer statute made the following provision for pending proceedings: "(a) All proceedings commenced under or by virtue of section four hundred twenty-nine of the judiciary law and pending immediately prior to the taking effect of the repeal of said statute, may be prosecuted and defended to final effect in the same manner as they might if such provisions were not so repealed."

The present proceeding, having been commenced and pending immediately prior to the taking effect of repeal of section 429, is thus to be prosecuted and defended to final effect under the old procedure.

In recognition of the jurisdictional problems, the parties stipulated before the Referee on May 25, 1976 that they would waive, to the extent that they had the right to do so, any jurisdictional defect that might result should the matter not be resolved by September 1, 1976 in the Appellate Division.

And, indeed, apparently in reliance upon the Appellate Division's continuing to have jurisdiction, the last brief was not submitted in this court until two months after September 1, 1976.

We think that in implementation of the transition from the old procedure to the new procedure, the Legislature had power to direct that proceedings commenced before the effective date of the constitutional amendment should be governed

by the former procedure, and we thus agree with the parties that we have jurisdiction to continue the matter.

## RESPONDENT'S JUDICIAL PERFORMANCE

### AS TO MATTERS NOT CHARGED

Petitioner states:

"Petitioner has conceded throughout these proceedings that there is no question as to Respondent's industriousness; nor is there any allegation of corruption."

The Referee has stated:

"All witnesses conceded that Respondent is one of the most conscientious Judges on the bench. He is prompt, he is hard-working, he is a strict disciplinarian, he is a competent and able Judge—by all accounts, he is a 'no-nonsense judge,' a 'tough judge,' a judge 'who is all business,' a 'fair judge,' a judge who wants cases to be settled or tried promptly without delay, a judge who works and follows the rules of the Admin-istrative Judge, a judge who adheres strictly to the philosophy of the Conference and Assignment system, a judge who brooks no tactical delays, a judge who is devoted to the integrity of the court and a judge who is constantly searching for the truth.

"No one ever impugned the integrity, the honesty or the industry of Respondent. The charges against him deal solely with his alleged lack of judicial temperament in violation of the cited canons."

With such an excellent record in all other areas of judicial performance, it is particularly painful that there should be these very serious charges against respondent in the area of judicial temperament and demeanor.

As a preliminary to our discussion as to particular com-plaints here involved, we wish to state our view that it is not improper for a Judge to be alert, to participate actively in settlement conferences, jury selection, or trials, to be strict in applying rules of the Conference and Assigment system (refer-red to below), very chary of granting adjournments, or even ready to refer cases of fraud or improper conduct to the appropriate authorities. A Judge need not be passive or timo-rous. He should control his courtroom. A Judge must be courteous, dignified, and impartial. With the overwhelming majority of our Judges, the problem simply does not exist. If they do what they think is right, they may occasionally be

reversed; differences of opinion are inevitable; but they do not come anywhere near to judicial misconduct.

## PREVIOUS COMPLAINTS

For some years there have from time to time been complaints about respondent's alleged breaches of judicial decorum, particularly in relation to allegations of rudeness, and insulting, high-handed, and arrogant behavior to litigants and lawyers. These complaints have been, among others, made to the Administrative Judge of the Civil Court of the City of New York who testified in support of respondent and who said that the complaints were "no more frequent" with respect to respondent than with many other Judges. However, respondent testified that the Administrative Judge did suggest to respondent that "perhaps I just be careful and watch myself as we went along."

In June 2, 1972, respondent was called before the Judiciary Relations Committee of the Appellate Division, First Department, and questioned with respect to his conduct in the case of *Ruane v City of New York* (which is also the subject of Charge 4 of this proceeding). In that case it was charged that respondent not only participated in the questioning of Mrs. Ruane, the plaintiff, in a way that departed from his role as an impartial judicial officer, but that after the parties determined to settle their case, respondent excoriated Mrs. Ruane in open court in the presence of Mrs. Ruane's 15-year-old daughter, calling her behavior "disgusting", stating that she had acted out of personal greed, and accusing her of attempting to misrepresent the facts to the court. During this, the daughter was crying. He also accused Mrs. Ruane's attorney, Mr. Gottlieb, of improper conduct. As a result of this complaint, Mr. Justice HECHT, in his capacity as Chairman of the Judiciary Relations Committee, gave the following sharp admonition to respondent on September 27, 1972:

"CHAIRMAN HECHT: * * * It is our opinion that your conduct was highly improper. The Committee was deeply disturbed, first, with the manner in which you conducted the examination of Mrs. Ruane. We feel that anyone viewing such an examination would reasonably conclude that you did not believe Mrs. Ruane's testimony and that you made a determined effort to convey that to the jury. This is wrong. Even more disturbing were the statements made in open court following settlement, first in the absence, then in the presence

of the jury. You took advantage of your position as a judge to excoriate publicly a member of the bar and a litigant. You charged them with criminal conduct and then added that you would seek an investigation by the Coordinating Committee. You were not only a complainant, you were judge and jury over the issue of misconduct which you raised. What is even worse is the complete insensitivity on your part in making your accusations in the absence of Mr. Gottlieb and in the presence of Mrs. Ruane's 15-year-old daughter. We expect that a person of your experience—indeed any member of the Judiciary—would recognize the importance of a mother-daughter relationship, especially where there is only one living parent. You did not even spare or consider the feelings of Mrs. Ruane's daughter. As to Mr. Gottlieb, as wrong as your statements would have been in his presence in open court, they were far worse in his absence. You failed in your obligation to a member of the Bar to give him notice so that he might appear and be heard, to lend some balance to a record such as this which attacks his professional reputation * * *. You distorted the nature of both the pre-trial conference and trial by jury. We agree that a judge, under appropriate circumstances, is justified in sending to the Bar Association a complaint against an attorney. * * * However, we regard the procedure of open court statements criticizing the ethics of lawyers or special 'hearings' used to level charges against them as wrong. Moreover, Judge, no matter how laudable your aims might be, respect for due process safeguards applies to lawyers and litigants in your courtroom. The robe you wear is a symbol of far more than a person who makes decisions in court. It symbolizes justice and impartiality. Just as any other important and sensitive power, yours, as a member of the bench, must be used with caution and restraint. A transcript has been made of these comments. The purpose of this is to maintain a full record of these proceedings. We are providing you with a copy of this admonition and trust future conduct will be guided accordingly."

### THE PRESENT CHARGES

There were 101 charges annexed to the present petition. These were summarized in the petition as follows:

"I. During calendar calls Judge Mertens acted in an injudicious, intemperate and discourteous manner by, among other things, shouting at and being rude to people appearing before

him, behaving in an abusive, demeaning or humiliating manner, or acting impatiently, irascibly or disrespectfully to attorneys making applications * * *

"II. During conferences Judge Mertens acted in an injudicious, intemperate and discourteous manner by, among other things, shouting at or being rude to people appearing before him, cutting attorneys off or being unwilling to listen to people making applications before him, behaving in an abusive, degrading or embarrassing manner, or acting impatiently or irascibly * * *

"III. During the selection of juries Judge Mertens unduly interfered with the right of attorneys to participate in the jury selection process by, among other things, treating attorneys in a rude or demeaning manner, angrily discouraging or intimidating attorneys from questioning prospective jurors, or arbitrarily and unreasonably limiting the scope of the questioning of the panel * * *

"IV. During trials Judge Mertens acted in an injudicious, intemperate and discourteous manner by, among other things, shouting at and being rude to attorneys, litigants, witnesses or jurors appearing before him, addressing them in a sharp, caustic, demeaning or sarcastic tone, acting in an irascible or impatient manner, or treating people disrespectfully or abusively * * *

"V. Judge Mertens was injudicious, intemperate and discourteous in that the Judge publicly attacked the integrity of people appearing before him by, among other things, accusing attorneys, litigants, witnesses, or doctors of lying, perpetrating frauds, presenting false claims, exaggerating injuries, 'building up' medical bills, or misrepresenting facts to the court * * *

"VI. Judge Mertens was injudicious and intemperate in that the Judge exerted undue pressure on attorneys to settle cases by, among other things, prejudging or adversely commenting upon the merits of a party's case, unnecessarily disparaging an attorney or litigant, or shouting at counsel and demanding that a case be settled * * *

"VII. Judge Mertens was injudicious and intemperate in that the Judge exerted undue pressure on attorneys to settle cases by, among other things, threatening attorneys with the filing of complaints with prosecutorial, disciplinary or administrative authorities, referring to the compiling of 'dossiers' on insurance companies' failure to bargain in good faith, or

threatening retaliation for a refusal to settle in accordance with his recommendation * * *

"VIII. Judge Mertens was injudicious and intemperate in that the Judge exerted undue pressure on attorneys to settle cases by, among other things, improperly refusing to honor attorneys' affidavits of actual engagement or otherwise arbitrarily denying reasonable requests for adjournments".

Of the 101 charges, the Referee, as we have said, sustained 50 charges, 36 in full and 14 in part.

Before us petitioner has not deemed it necessary to ask us to overrule the Referee as to the charges he did not sustain. Accordingly, we confine ourselves to the consideration of the charges that the Referee did sustain.

The Referee heard and saw the witnesses and conscientiously and painstakingly resolved the facts. We accept the Referee's findings on the facts (with one or two exceptions, insignificant in number or effect for our purposes, where the Referee made some inadvertent errors). Accepting the Referee's findings as to the underlying facts, we must consider whether these findings amount to cause for judicial removal or censure.

We note that of the charges sustained, 33 (numbered "23" and up) relate to incidents after September 27, 1972, the date of the Judiciary Relations Committee's admonition.

### DENIAL OF ADJOURNMENTS;

#### THE CONFERENCE AND ASSIGNMENT SYSTEM

Respondent has been particularly industrious, vigorous, and effective in the implementation of the Conference and Assignment system in use in the Civil Court and in some parts of the Supreme Court. Under this system, cases are assigned to a group or team of Judges. One of the Judges has a conference with the parties with a view to settling the case. And if the case is not settled, he promptly assigns the case to one of the other Judges for immediate trial, subject only to the trial schedule of the Trial Judge. The system has been extremely successful in eliminating calendar congestion in the Civil Court and greatly reducing it in the Supreme Court. An extremely important element of the system is strictness in refusing adjournments once the case is assigned for trial. In an address by Judge THOMPSON, the then Administrative Judge of the Civil Court, before an American Judges Associa-

tion Conference in Portland, Oregon, in October 1974, on "Pre-Trial Settlement Techniques," Judge THOMPSON describing the Conference and Assignment system concluded with these remarks: "It is well-nigh impossible to obtain an adjournment once the case has been assigned to the trial judge. Any laxity in the handling of requested adjournments would result in a breakdown of the system because then the Court would lose the momentum and impact afforded by the prospect of immediate trial."

Respondent has been extremely strict in the application of these rules. The petition does not criticize respondent for this. Nor do we.

If some of us in some cases might have been more flexible in granting adjournments, respondent's strictness was not improper, and a fortiori, was not misconduct. For the most part, they cannot even be called error, although a couple of cases have been called to our attention in which strictness did indeed legally amount to "abuse of discretion." But even that is not judicial misconduct. In connection with the grant or denial of adjournments, Respondent was merely exercising his judicial function, and that exercise, even though sometimes erroneous, was not misconduct.

In this respect, we disagree with the Referee who sometimes sustained charges on the basis of failure by respondent to grant adjournments where the Referee deemed a more tolerant and understanding attitude to attorneys and litigants and to their exigencies would have been proper.

To the extent that the Referee sustained charges of misconduct on the basis of failure to grant adjournments, as distinct from the manner of doing so (Charges 1, 14 [c], 28, 30 [b], 43, 56, 59 [b], 60, 71 [b], 89 [b], 95), we overrule the Referee's report and find such refusals not to amount to judicial misconduct.

### JURY SELECTION

We agree with the Referee and petitioner that attorneys have a right to participate directly in the *voir dire* on selection of juries. The Judge also has a right to participate in it, actively if he sees fit, though of course always impartially. He also has a right to control the attorney's questioning so as to limit questions to their proper function of determining whether the juror will be impartial and will decide on the

basis of the law and the evidence, to avoid repetition, and in general to avoid excessively long and time-wasting voir dire or voir dire designed not toward selection of an impartial jury but toward conditioning the jury in favor of a particular side or view of the case. The degree of the Judge's participation and control must largely rest in the Judge's discretion. Apparently respondent prefers the Federal court method of jury selection, where the Judge does substantially all the questioning, to the State court method. It may well be that in several cases respondent controlled the voir dire too strictly and unduly limited the attorney's participation. These are matters of degree which may constitute an abuse of judicial discretion. In our view they do not constitute judicial misconduct. To the extent that the charges sustained by the Referee rest on the fact of such excessive control (rather than the manner of such control) we do not sustain and we overrule in part Charges 12, 17, 60 (c) and 62.

However, with respect to Charge 62, we agree with the Referee that it was improper—going far beyond abuse of judicial discretion—for respondent not to accede to the attorney's request—three times made—to have a reporter present when the Judge participated in and allegedly excessively controlled the voir dire. Respondent explains this on the ground that the voir dire was taking place in a jury selection room where there was no reporter present and he would have permitted the parties to record their objections when they returned to the courtroom. That is not sufficient. The parties are entitled to have a simultaneous stenographic record made. If the Judge is acting judicially and formally—as he is if he presides at or participates in the voir dire—he is holding court there and the parties are just as much entitled to have a reporter there as in the courtroom. Whenever the Judge is exercising his formal powers, he is holding court. We sustain so much of Charge 62 as is based on the failure to accede to the attorney's request to have a stenographic record of the objections and proceedings.

### PARTICIPATION IN TRIALS

Closely related to the question of misconduct based on the Judge's excessive participation in the jury selection process is that of his proper role in the conduct of the trial and particularly, the questioning of witnesses. Again, under our system, it is the lawyers who must carry the major burden of adducing

the evidence, questioning the witnesses, etc. But even there, there is a proper role for the Judge in clarifying matters in focusing the efforts of all parties on the relevant issues, etc. And in a nonjury case where the Judge is the trier of the facts, so that it is his responsibility to try to arrive at the truth in his own mind, even greater scope properly exists for the Judge's active participation.

In that respect, we do not agree with the Referee as to Charge 85 and we do not find that charge to constitute misconduct. There in a nonjury case involving issues of fraud and study of financial records and transactions, book accounts, alleged diversions of funds, tracing items in books, etc., respondent took a very active role in the questioning of witnesses. In a nonjury case, particularly of this type, we do not think this was misconduct. After some substantial evidence had been introduced by plaintiff, defendant's attorney said that there was no evidence yet of fraud. Respondent thereupon said that defendant's attorney was under an illusion if he thought there was no evidence yet of fraud although, of course, later evidence might refute that. In a nonjury case, this may be proper as the interests of justice are better served if attorneys know they have a case to meet than if through ignorance or overconfidence, they merely rely on a nonexistent failure of their adversary's proof. Although respondent may have been somewhat over-repetitious, forceful, and even sarcastic in these observations, we do not think they constituted judicial misconduct.

### RESPONDENT'S ACCUSATIONS OF

### FRAUD AND IMPROPRIETY

Petitioner charges and the Referee has found that in many cases respondent publicly attacked the integrity of people appearing before him by, among other things, accusing attorneys, litigants, witnesses, or doctors of lying, perpetrating frauds, presenting false claims, exaggerating injuries, building up medical bills, or misrepresenting facts to the court; and by threatening to take action against such persons because of such alleged conduct.

We must say that in a number of such cases respondent's suspicions appear to have been not unreasonable, and in many, his conduct was not unprovoked. (Charges 11, 18.)

Again, an alert Judge sitting in a busy trial and conference part may come to recognize the names of doctors which recur particularly frequently in support of litigants' claims or defenses, or even of doctors who apparently give affidavits far more frequently than they are willing to appear in court to support those affidavits.

But a Judge is a Judge; not a prosecutor or an investigator. He may not act on suspicion. He must maintain an *atmosphere* of impartiality, and *be* impartial, even though his suspicions have been aroused. Parties must feel that if they have a claim, the Judge will listen to it impartially, or let the jury listen to it. And they must be able to do so without fear that the Judge has already made up his mind that they are dishonest, or exaggerating, or acting in bad faith and will probably cause them to suffer severe consequences beyond the loss of the particular case if they persist—e.g., prosecution, disciplinary proceedings, complaints to the Insurance Department, etc.

The Referee found that respondent was far too ready and too hasty in making such threats which could only intimidate parties and counsel; and in this respect, we agree with the Referee in sustaining the portions of Charges 4, 5, 6, 11, 17, 18, 66 (a) and 80 (b), relating to the making of such charges and threats by respondent.

This is not to say that a Judge should not refer cases of improper conduct to the appropriate authorities; or even in rare cases point out in a dignified way the inevitable suspicions that arise in a particular fact situation. But he must lean over backward and err on the side of making sure that he does not intimidate the parties from pursuing legitimate claims or improperly influence the jury.

In this area however, we do not sustain Charges 66 (b) and (c) insofar as they relate to threats, as it does not appear to us that respondent's conduct in those cases amounted to improper threats.

### JUDICIAL TEMPERAMENT

Although the remaining charges are broken down into several categories, they amount in essence to a failure, if not a lack, of judicial temperament manifesting itself by shouting at parties, witnesses, and lawyers, rudeness, sarcasm, abuse and bullying toward them, unwarranted pressures to induce settle-

ment, and some instances of extremely high-handed conduct and abuse of authority.

The Referee sustained a large number of these charges. The charges have been denied; and many witnesses testified to respondent's proper behavior both on the occasions complained of and other occasions. But this type of improper conduct has been testified to in too many instances by too many lawyers for us to reject the Referee's findings as to these charges.

In case after case, the Referee has found that respondent suddenly exploded in angry shouting sometimes described as yelling and screaming at lawyers and witnesses. (See, e.g., Charges 7, 12, 17, 18, 19, 26, 30 [b], 43, 51 [b], 59 [b], 62, 63 [b], 66 [b], 71 [b], 75, 77, 80 [b], 81, 83 [b], 86, 89 [b].) We sustain those charges in this respect.

In one case, an attorney who had just come back to work after having a pace-maker installed in his heart answered a calendar for an office associate who was engaged in another trial and requested an adjournment. Respondent's response in denying the application was so harsh, "like a drill sergeant calling a private to task for one reason or another," that the attorney was visibly shaking, his hands were shaking (Charge 60).

Respondent was frequently rude, sarcastic, disparaging, and abusive to lawyers. (Charges 2, 30 [b], 46, 54 [b], 56, 59 [b], 69 [c], 71 [b], 72, 75, 84.)

Respondent was occasionally inconsiderate of young and inexperienced attorneys. (Charges 8, 23, 81, 83 [b].)

On occasions respondent lectured lawyers not to ask for adjournments in a manner described as "demeaning," as if we were "schoolboys" (Charge 47). Sometimes he made a rather long speech at the opening of court, explaining the Conference and Assignment system, indicating that adjournments were not likely to be granted and saying that lawyers were "lazy," "never prepared," "did not come to negotiate in good faith," that there were "too many phony cases" (Charges 55, 75).

During calendar calls, respondent "shouted," was "very angry," "sarcastic," "abusive," "hostile" to attorneys who were asking for adjournments (Charges 14 [a], 55, 75).

In two cases when, as the respondent was in the act of excusing the jury, one of the jurors got up before the respon-

dent had finished, respondent shouted at the juror, reproving him for starting to leave (Charges 30 [b], 77).

Respondent sometimes made statements to juries after cases were disposed of, disparaging the attorneys and the good faith of the case. (Charges 6, 10, 11.)

In one case where he suspected fraud, respondent, after deciding the issue for defendant and believing there was fraud on the plaintiff's part, shouted to have the doors to the courtroom closed and said in an angry manner he would refer the matter to the District Attorney (Charge 18). In that case, the successful attorney "tried to apologize" to the attorney whose case was thus criticized.

Respondent used excessive pressure to force settlements.

He told insurance companies, in the course of settlement discussions, that he was keeping a dossier of companies that did not bargain in good faith, which he would refer to the Superintendent of Insurance (Charges 5, 8, 66 [a]). He referred to one insurance company as "cheapskates" and "chiselers" (Charge 80 [b]).

Respondent was described as arrogant, dictatorial, attempting to frighten parties into a settlement, demeaning, loud, degrading toward attorneys (Charges 12, 14, 39, 54 [c]).

He was high-handed, arrogant, and abused his authority in a number of cases. On at least two occasions he required attorneys to remain in court even though one attorney was ill (Charge 1), and another attorney's case had already been adjourned (Charge 15). In a case in which he thought (perhaps justifiably) that injuries were being exaggerated, he demanded that an attorney turn over his entire file to respondent for his examination (Charge 13).

In another case, after all the evidence was in, respondent recommended a settlement for $25,000. Plaintiff rejected this. The jury brought in a verdict for $30,341. Respondent granted a motion for a new trial unless plaintiff consented to a reduction to $20,000 (Charge 3).

In one case, in which he thought the papers on an infant settlement case were insufficient, he yelled at the attorney, told the client that the attorney was incompetent and that the client should go to a doctor and that the attorney would have an affidavit drawn and the expense would be borne by the attorney (Charge 59 [c]).

The extreme degree of respondent's breaches of judicial

temperament has been commented on by persons who appeared before him.

One lawyer said that in the last three years he had not found any Judge to be as rude as respondent (Charge 12). Other comments: "I have never seen a judge act that way" (Charge 17). "Have you ever seen anything like this?" (Charge 62.) "He is something, isn't he?" "I never heard a judge address lawyers or myself in the manner [Respondent did]" (Charge 75).

Self-evidently, breaches of judicial temperament are of the utmost gravity.

As a matter of humanity and democratic government, the seriousness of a Judge, in his position of power and authority, being rude and abusive to persons under his authority—litigants, witnesses, lawyers—needs no elaboration.

It impairs the public's image of the dignity and impartiality of courts, which is essential to their fulfilling the court's role in society.

Attorneys and litigants noticed and commented on the ambience of "intensity" in the court (Charge 54 [b]), and the lack of appearance of justice (Charge 17), and the apparent mistreatment of litigants and lawyers (Charges 33, 37, 59 [c], 83 [b]).

One of the most important functions of a court is to give litigants confidence that they have had a chance to tell their story to an impartial, open-minded tribunal willing to listen to them. And lawyers must feel free to advance their client's cause—within the usual ethical limitations—without fear of being subjected to unpredictable anger, abuse, or threats. Parties must not be driven to settle cases out of such fear.

Yet there are repeated instances where the attorneys reported such deficiencies—that they felt nervous, frightened, and inhibited in the conduct of their cases for fear that respondent might explode at them (Charges 12, 14, 54 [c], 81, 83 [b]); they felt "pushed around" (Charge 54 [b]). Litigants and lawyers settled cases rather than expose themselves to respondent's conduct (Charges 59 [b], 62, 71 [b], 75). Some lawyers said that they would prefer not to appear before respondent again (Charges 54 [c], 71 [b]).

The charges above referred to with respect to breaches of judicial temperament and decorum are sustained.

SANCTIONS

Against these serious breaches of judicial temperament and decorum, with their very serious consequences, we must balance the fact that respondent is an extremely effective, able, hard-working Judge; that there is no suggestion of dishonesty; and that he is an elected Judge, with a long and honorable career at the Bar, in public service, and on the Bench.

Our options as to sanctions are apparently removal, censure, or dismissal of charges.

We do not feel justified in removing respondent. We think he should be severely censured.

Respondent is censured.

MURPHY, J. (dissenting in part). I agree with the majority's findings with regard to the charges but I disagree as to the penalty to be imposed upon the respondent. As is emphasized in the majority opinion, the respondent was admonished in 1972 by the Chairman of the Judiciary Relations Committee for the same type of misbehavior as is the subject of this removal proceeding. From the very fact that countless charges are now sustained against him, it is evident that the respondent did not heed the warning that was graciously extended to him in 1972. Instead, he continued his grossly abusive, discourteous, insensitive and insulting behavior as a member of the Bench. At a time when the Judiciary is under attack from many quarters, its critics can again revel in the meek reproof now accorded the respondent for his "serious breaches of judicial temperament and decorum". The highly injudicious conduct of the respondent warrants his removal from the Bench.

STEVENS, P. J., MARKEWICH, SILVERMAN and LYNCH, JJ., concur in *Per Curiam* opinion; MURPHY, J., dissents in part in an opinion.

Respondent censured.